STANDARD OIL COMPANY OF NEW YORK, Appellant, Respondent, *v.* CENTRAL DREDGING COMPANY and Another, Respondents, Appellants.

Third Department, March 7, 1929.

*Whalen, Murphy, McNamee & Creble [Robert E. Whalen* of counsel], for the plaintiff.

*Alfred M. O'Neill [John J. McManus* of counsel], for the Central Dredging Company.

*Parsons, McClung & Rose [Charles B. Sullivan* of counsel], for the National Surety Company of New York.

HILL, J.   Defendant contracted to dredge 40,000 cubic yards of earth from the Hudson river in front of plaintiff's premises

on Van Rensselaer island and deposit it thereon, also to deposit there 100,000 cubic yards of spoil from a government contract upon which it was then working. Payment was to be made at the rate of forty cents a cubic yard for earth taken from the river near plaintiff's premises, twelve cents a cubic yard for that from the government contract. The contract between the United States government and the dredging company contained the provision that the spoil produced " must be transported and deposited in the area east of Campbell Island dyke on the eastern shore of the river, about six miles south of Albany." This had been changed, and the spoil, at the time of making the contract in suit, was being deposited on Bonacker island, about two miles from the government work. The contract with the government required that if spoil was deposited on private property " the contractor shall obtain the written consent of the owners before proceeding with the work. The United States will not make any reduction in the contract price if the material is disposed of in this manner." This indicates that defendant dredging company might have opportunity to dispose of spoil produced under the government contract at a profit, and if such opportunity came, and the government approved, it would make no claim for any of the profit.

According to the terms of the contract with plaintiff, defendant was required " to apply for and obtain any necessary permits from town, municipal, State or Federal authorities to complete the said work." Defendant began work upon the contract, dredged 2,250 cubic yards of earth from the river in front of plaintiff's premises and placed it thereon. The contract was abandoned when the United States Division Engineer declined to sanction the dumping of spoil into the river at the place dredged in front of plaintiff's lands, from which point it was to be transferred to the uplands by hydraulic suction.

The circumstances connected with the refusal were that the Resident Assistant Engineer at Albany made the following indorsement upon defendant's application: " There is no objection to the proposed dumping excepting that it is not deemed advisable to dump the material eastward of the red line on the blue print. It is recommended that permission for the spoiling in question, subject to that proviso, be granted." The Division Engineer, withholding his approval, wrote: " In view of the complaints regarding shoaling of the Hudson River at Albany, I do not consider it advisable to grant this request, and the dumping grounds designated in the contract must be adhered to." The determination of the Division Engineer could have been reviewed by the Chief Engineer, and his in turn by the Secretary of War.

As the use of government spoil was contemplated, defendant argues that the refusal abrogated the contract, under the rule that when the continued existence of a thing is assumed as the basis of an agreement, its destruction or unavailability puts an end to the obligation. Defendant failed to show sufficient diligence in its effort to obtain the permit. By negotiations it might have overcome the objection of the Division Engineer as to the danger of shoaling. This could have been effected by removing the spoil from the barges to the upland without the intermediate dumping in the river. Difficulty or even improbability of accomplishment without great financial loss will not release an obligor. It must be shown, to establish a defense under these conditions, that the thing cannot by any means be effected. (*Harmony* v. *Bingham*, 12 N. Y. 99; *Dexter* v. *Norton*, 47 id. 62; *Booth* v. *Spuyten Duyvil Rolling Mill Co.*, 60 id. 487; *Cameron-Hawn Realty Co.* v. *City of Albany*, 207 id. 377; *Mortimer* v. *Otto*, 206 id. 89.) Had neither party agreed to be responsible for the availability of the government spoil, it might well be that the contract would be subject to the implied provision that if it became unavailable through no fault of either party, each would be excused. (*Texas Co.* v. *Hogarth Shipping Co.*, 256 U. S. 619.) Such was not the condition. Defendant obligated itself that the spoil would be available when its officers knew that permission would have to be obtained, and failure could have been guarded against in the contract. (*Chicago, Milwaukee & St. Paul Railway Co.* v. *Hoyt*, 149 U. S. 1; *Cameron-Hawn Realty Co.* v. *City of Albany, supra; Raner* v. *Goldberg*, 244 N. Y. 438.)

Defendant would have violated a Federal statute if it had used the government spoil without permission. (Rivers and Harbors Act of 1905 [33 U. S. Stat. at Large, 1147], § 4, approved March 3, 1905; now U. S. Code, tit. 33, § 419.) From this defendant argues that performance involved the commission of a crime, and that, therefore, the contract was invalid. This position is untenable. (*Raner* v. *Goldberg, supra.*) The opinion in that case (at p. 440) states " the parties in making the contract or lease did not intend that the premises should be used for an illegal purpose. They intended that the demised premises should be used as a dance hall only when the lessee had obtained a license. A contract so made is not unlawful. (*Shedlinsky* v. *Budweiser Brewing Co.*, 163 N. Y. 437.) "

After ample notice to the defendant and its surety, plaintiff contracted for the performance of the work which defendant had abandoned. The new contractor was to dredge 37,750 cubic yards from the river in front of plaintiff's premises, and the additional 100,000 cubic yards of filling material could be obtained from any

point in the river selected by the contractor. The new price was fifty-two cents a cubic yard for all spoil deposited. Damages are claimed for the following items: The difference between the new and old contract price for the 37,750 cubic yards, which amounted to $4,530. Against this was to be allowed a credit of $900 for work done by defendant, leaving a balance of $3,630. The difference between the new and old contract price for 100,000 cubic yards, $40,000. The expense of moving earth by hand from plaintiff's uplands to the location which defendant was to fill, $7,453.77. Plaintiff asserts its right to this item because the filling was to have been completed on December 1, 1923, to permit the erection of oil tanks early in 1924. The steel for the tanks was delivered before the letting of the new contract.

The first item was properly allowed. The second item was allowed at $13,000. The court fixed twenty-five cents a cubic yard as a reasonable price for 100,000 cubic yards of fill. The evidence most favorable to the defendant does not justify a lower price than forty cents a cubic yard. This item should be increased from $13,000 to $28,000. While under the new contract, plaintiff paid the same price for all the material, a trier of the facts would be justified in establishing a differential between the 37,750 cubic yards which involved submarine excavation, in which the resulting contour of the river bottom had to be regarded, and a definite amount of spoil taken from a limited area even though it was difficult, and the 100,000 cubic yards as to which the sole requirement was the production of filling material, and the dredging could be done at any place in the river advantageous in respect of location and ease of moving earth. The third item was properly disallowed. Nothing in the contract indicates that the parties had in mind the purposes for which the fill was to be made, and the complaint does not allege special damages. (*Jutte* v. *Hughes,* 67 N. Y. 267; *Argotsinger* v. *Vines,* 82 id. 308; *Isman* v. *Loring,* 130 App. Div. 845.) Even if defendant was chargeable with knowledge that the filling was to provide a foundation for oil tanks, the proper measure of damage would have been the value of the use of the tanks while plaintiff was deprived thereof in consequence of the delay. (*Ruff* v. *Rinaldo,* 55 N. Y. 664; *Hexter* v. *Knox,* 63 id. 561; *Cassidy* v. *LeFevre,* 45 id. 562; *Reisert* v. *City of New York,* 174 id. 196; 9 C. J. 793.)

VAN KIRK, P. J., HINMAN, DAVIS and WHITMYER, JJ., concur.

Judgment modified by increasing the amount of plaintiff's damages to $31,630, with interest thereon from March 20, 1926, and as so modified affirmed, with costs to the plaintiff.

The court disapproves of that portion of finding numbered fourteen wherein twenty-five cents per cubic yard was found to be the fair and reasonable amount for the procuring of said waste material, independent of the dredging and construction of additional basin and approach, and that the plaintiff was compelled to and did incur and disburse at least the sum of $13,000 in excess of the amount provided and contracted to be paid by the Central Dredging Company for the procuring of 100,000 cubic yards of spoil and waste material; and of that portion of finding numbered fifteen " that the reasonable value of such services of placing material upon plaintiff's property, independent of any benefits of the dredging, would be twenty-five cents per cubic yard, or for the 100,000 cubic yards the sum of $25,000, which would be an amount of $13,000 in excess of the contract price; " and finds in lieu thereof that the fair and reasonable amount for the procuring of said waste material was forty cents per cubic yard, and that the total damage sustained by plaintiff in that respect is $28,000.